## NATIONAL RAILROAD PASSENGER CORP. ET AL. *v.* NATIONAL ASSOCIATION OF RAILROAD PASSENGERS

No. 72–1289.   Argued November 12, 1973—Decided January 9, 1974

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, MARSHALL, BLACKMUN, and REHNQUIST, JJ., joined.  BRENNAN, J., filed an opinion concurring in the result, *post*, p. 465.  DOUGLAS, J., filed a dissenting opinion, *post*, p. 466.  POWELL, J., took no part in the consideration or decision of the case.

*E. Barrett Prettyman, Jr.,* argued the cause for petitioners.  On the brief were *William O. Bittman, Curtis E. Von Kann,* and *Charles A. Horsky.*

*Gordon P. MacDougall* argued the cause and filed a brief for respondent.*

Mr. Justice Stewart delivered the opinion of the Court.

The respondent, the National Association of Railroad Passengers (NARP), brought this action in the District Court to enjoin the announced discontinuance of certain passenger trains that had previously been operated by the Central of Georgia Railway Co. (Central). Named as defendants were Central, its parent, Southern Railway Co. (Southern), and the National Railroad Passenger Corp. (Amtrak), all of which are the petitioners in this Court. The question before us is whether this action is maintainable under applicable federal law.

After the enactment of the Rail Passenger Service Act of 1970 (Amtrak Act), 84 Stat. 1327, 45 U. S. C. § 501 *et seq.*, Central contracted with Amtrak for the latter to assume Central's intercity rail passenger service responsibilities.[1] Southern has not entered into any contract with Amtrak. The train discontinuances that precipitated this action were announced by Amtrak pursuant to § 404 (b)(2) of the Amtrak Act, 45 U. S. C. § 564 (b)(2).[2] The gravamen of the respondent's com-

---

*\*Paul Rodgers* and *Sumner J. Katz* filed a brief for the National Association of Regulatory Utility Commissioners as *amicus curiae* urging affirmance.

[1] Section 401 of the Act, 45 U. S. C. § 561, authorizes Amtrak to contract with any railroad to undertake its entire responsibility for intercity rail passenger service. Upon entering such a contract, a railroad can discontinue any intercity passenger train by merely filing a 30-day notice of intent with the Interstate Commerce Commission, in accordance with the notice requirements of § 13a of the Interstate Commerce Act, 49 U. S. C. § 13a.

[2] Except in certain limited situations not here pertinent, 45 U. S. C. § 564 (b)(2) authorizes Amtrak to discontinue any passenger service,

plaint was that these discontinuances are not authorized by, and in fact are prohibited by, the Amtrak Act.[3] The District Court concluded that the respondent lacks standing under § 307 of the Amtrak Act, 45 U. S. C. § 547, and accordingly dismissed the action. The Court of Appeals reversed and held that the respondent has standing and that § 307 does not otherwise bar such a suit by a private party who is allegedly aggrieved.[4] We granted certiorari to decide whether such a private cause of action can be maintained in light of § 307 (a) of the Amtrak Act. 411 U. S. 981 (1973).

In this Court and in the Court of Appeals, the parties have approached the question from several perspectives. The issue has been variously stated to be whether the Amtrak Act can be read to create a private right of action to enforce compliance with its provisions; whether a federal district court has jurisdiction under the terms of

other than that contained in a "basic system" designated by the Secretary of Transportation, upon its own initiative.

[3] The respondent's position on the merits is based on the fact that Central, which entered a contract with Amtrak, is a subsidiary of Southern, which did not enter a contract with Amtrak. The respondent contends that the contract between Amtrak and Central does not comply with § 401 (a) (1) of the Amtrak Act because Southern, the parent company, has not contracted with Amtrak. Since § 401 (a) (1) authorizes only a contract for Amtrak to undertake a railroad's *entire* responsibility for intercity rail passenger service, the respondent contends that Southern cannot relieve itself of only *part* of this responsibility by allowing a subsidiary to contract with Amtrak while declining itself to do so. Accordingly, the respondent argues that Southern and Central, having entered no statutorily authorized contract with Amtrak, are prohibited by § 404 (a), 45 U. S. C. § 564 (a), from discontinuing any passenger train before January 1, 1975.

[4] The decision of the District Court is unreported. The opinion of the Court of Appeals appears at 154 U. S. App. D. C. 214, 475 F. 2d 325 (1973).

the Act to entertain such a suit; and whether the respondent has standing to bring such a suit. Because the reference in each instance is to § 307 (a) of the Act and the legislative history behind that provision, these questions overlap in the context of this case even more than they ordinarily would. But, however phrased, the threshold question clearly is whether the Amtrak Act or any other provision of law creates a cause of action whereby a private party such as the respondent can enforce duties and obligations imposed by the Act; for it is only if such a right of action exists that we need consider whether the respondent had standing to bring the action and whether the District Court had jurisdiction to entertain it.

The respondent has pointed to no provision of law outside the Amtrak Act itself that can be read to create or imply the cause of action that it seeks to bring against the petitioners. It follows that support for the bringing of this action must be found, if at all, within the four corners of that Act. The only section of the Act that authorizes any suits to enforce duties and obligations is § 307 (a), which provides:

> "If the Corporation or any railroad engages in or adheres to any action, practice, or policy inconsistent with the policies and purposes of this chapter, obstructs or interferes with any activities authorized by this chapter, refuses, fails, or neglects to discharge its duties and responsibilities under this chapter, or threatens any such violation, obstruction, interference, refusal, failure, or neglect, the district court of the United States for any district in which the Corporation or other person resides or may be found shall have jurisdiction, except as otherwise prohibited by law, upon petition of the Attorney General of the United States or, in a case involving a labor agreement, upon petition of any employee affected

thereby, including duly authorized employee representatives, to grant such equitable relief as may be necessary or appropriate to prevent or terminate any violation, conduct, or threat." 45 U. S. C. § 547 (a).

In terms, § 307 (a) purports only to confer jurisdiction, not to create a cause of action. The legislative history, however, makes clear that the congressional purpose was to authorize certain types of suits for the enforcement of the Act's provisions. The House Report explained the section as follows:

"Section 307 authorizes the Attorney General of the United States to sue the corporation or any railroad to prevent acts of omission or commission in violation of this legislation. In the case of labor agreements, individual employees or duly authorized employee representatives may sue for equitable relief." H. R. Rep. No. 91–1580, p. 9 (1970).

In light of the language and legislative history of § 307 (a), we read it as creating a public cause of action, maintainable by the Attorney General, to enforce the duties and responsibilities imposed by the Act. The only private cause of action created by that provision, however, is explicitly limited to "a case involving a labor agreement." Thus, no authority for the action the respondent has brought can be found in the language of § 307 (a). The argument is made, however, that § 307 (a) serves only to *authorize* certain suits against Amtrak and that it should not be read to *preclude* other private causes of action for the enforcement of obligations imposed by the Act. The respondent claims that railroad passengers are the intended beneficiaries of the Act and that the courts should therefore imply a private cause of action whereby they can enforce compliance with the Act's provisions. See *J. I. Case Co.* v. *Borak*, 377 U. S. 426, 431–432 (1964). It goes without saying,

however, that the inference of such a private cause of action not otherwise authorized by the statute must be consistent with the evident legislative intent and, of course, with the effectuation of the purposes intended to be served by the Act.

A frequently stated principle of statutory construction is that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies. "When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." *Botany Mills* v. *United States*, 278 U. S. 282, 289 (1929). This principle of statutory construction reflects an ancient maxim—*expressio unius est exclusio alterius*. Since the Act creates a public cause of action for the enforcement of its provisions and a private cause of action only under very limited circumstances, this maxim would clearly compel the conclusion that the remedies created in § 307 (a) are the exclusive means to enforce the duties and obligations imposed by the Act. But even the most basic general principles of statutory construction must yield to clear contrary evidence of legislative intent. *Neuberger* v. *Commissioner*, 311 U. S. 83, 88 (1940). Accordingly, we turn to the legislative history of § 307 (a).

The original draft of § 307 (a) differed from its present form in several respects. It conferred upon federal district courts jurisdiction to entertain suits against Amtrak (but not individual railroads) "upon petition of the Attorney General of the United States or, in a case involving a labor agreement, upon petition of any individual affected thereby . . . ." [5] At the hearings of the House

---

[5] Supplemental Hearings on H. R. 17849 and S. 3706 before the Subcommittee on Transportation and Aeronautics of the House Committee on Interstate and Foreign Commerce, 91st Cong., 2d Sess., ser. 91–62, p. 44 (1970).

Committee, representatives of organized labor took issue with certain aspects of the draft provision and proposed several changes. One of these proposals would have authorized suits against the railroads as well as Amtrak. Another would have authorized private suits by "any person adversely affected or aggrieved thereby, including the representatives of the employees of any railroad or of the Corporation." In support of the latter proposal, one labor spokesman testified:

> "The . . . amendment we propose would modify the language of section 307 (a) . . . so as to provide that any aggrieved party, including employee representatives, could institute legal proceedings for violations of the law.

> .        .        .        .        .

> "*As the bill now reads, only the Attorney General, except in cases involving a labor agreement, could bring such actions.*" Supplemental Hearings on H. R. 17849 and S. 3706 before the Subcommittee on Transportation and Aeronautics of the House Committee on Interstate and Foreign Commerce, 91st Cong., 2d Sess., ser. 91–62, p. 134 (1970) (emphasis added).

The Secretary of Transportation, who was to be the primary administrative officer responsible for the implementation of the Act, sent a letter to the Subcommittee chairman commenting on these proposed changes. His letter stated that he did not object to allowing suits against railroads as well as Amtrak.[6] As to the proposal

---

[6] Although the Secretary did not oppose this amendment, he expressed the opinion that it might be unnecessary to make sanctions applicable to any railroad in light of other, existing statutes and in light of Amtrak's amenability to suit under § 307 (a) as it was then written.

to amend the bill to permit suits by any "aggrieved person," however, he stated:

> "Sanctions are normally imposed by the Government. Consequently, I would be opposed to permitting 'any person' to seek enforcement of section 307. I would have no objection, however, if the section were revised to permit employee representatives, as well as employees adversely affected, to seek equitable relief." Hearings, *supra*, at 85.

Thereafter, the Committee redrafted § 307 (a) in conformity with the Secretary's recommendations. The Committee's redraft and the bill as finally enacted authorized suits against railroads as well as Amtrak, and permitted suits involving labor agreements by "duly authorized employee representatives" as well as by affected employees, but did *not* authorize suits by "any person adversely affected or aggrieved."

Both the Secretary of Transportation and the representatives of organized labor thus interpreted § 307 (a) in its present form as precluding private actions other than those specifically authorized therein. Although the transcript of the House Committee hearings does not indicate that any Committee member voiced explicit affirmative agreement with this interpretation, it is surely most unlikely that the members of the Committee would have stood mute if they had disagreed with it. Especially in light of the Secretary's substantial role in the eventual implementation of the Act,[7] we cannot conclude that his interpretation of its draft provisions was not accorded significant weight by the Committee.

The members of the Committee had before them a specific proposal that would have altered the interpretation that was being placed on § 307 (a), and would have

---

[7] See, *e. g.*, 45 U. S. C. §§ 521, 522, 548 (c), 563 (a), 602, 621, and 645 (1970 ed. and Supp. II).

explicitly permitted suit to enforce the Act's provisions by "any person adversely affected or aggrieved." The Committee's deliberate failure to adopt that proposal, after learning of the Secretary's views, cannot but give weight to the conclusion that the Committee agreed with the Secretary's interpretation of the meaning and effect of the existing language, as well as with his opposition to the proposed change. These factors are substantial indicia that the legislators understood that § 307 (a) as written would preclude private causes of action to enforce compliance with the Act, other than in the limited area of cases "involving a labor agreement." We have found no contrary indication in any of the hearings or committee reports. Thus, the explicit legislative history of § 307 (a), such as it is, serves to support the same interpretation of its language that would be accorded by settled rules of statutory construction.

This construction of § 307 (a) is also completely consistent with the Act as a whole and with its more generalized legislative history. In outlining the purpose of the Amtrak Act, the House Report, referring to a comment by the Secretary of Transportation, noted that "[i]n order to achieve economic viability in a basic rail passenger system, . . . there will have to be a 'paring of uneconomic routes.'" H. R. Rep. No. 91–1580, p. 3 (1970). Thus, Congress concluded that "a rational reduction of present service will be required in order to save *any* passenger service." *Ibid.* (emphasis in original). In § 404 of the Act, Congress provided an efficient means whereby Amtrak could eliminate uneconomic routes (other than a "basic system" designated and from time to time augmented by the Secretary of Transportation) without the necessity of submitting to the time-consuming proceedings of state regulatory bodies or the Interstate Commerce Commission that had been required

before the Act's passage.[8]  If, however, § 307 (a) were
to be interpreted as permitting private lawsuits to pre-
vent the discontinuance of passenger trains, then the only
effect of the Act in this regard would have been to sub-
stitute the federal district courts for the state or federal
administrative bodies formerly required to pass upon pro-
posed discontinuances.[9]

[8] See n. 2, *supra.*

[9] Before 1958, railroads desiring to discontinue uneconomic pas-
senger routes were required to secure the permission of state regula-
tory commissions.  In 1958, in an effort to reduce losses on passenger
train operations, Congress enacted § 13a of the Interstate Commerce
Act, 49 U. S. C. § 13a, which gave the railroads the option of
bypassing state agencies and petitioning the Interstate Commerce
Commission for permission to discontinue passenger trains.  Under
§ 13a, after the railroad has filed a notice of discontinuance with the
Commission, an aggrieved person may file a complaint.  Either upon
such complaint or on its own initiative, the Commission may institute
an investigation of the proposed discontinuance.  If the Commission
does begin an investigation, it may delay the discontinuance for as
long as four months.  If it finds that the discontinuance is contrary
to the public interest, the Commission may require the continuance
of the route for a period of one year.  Orders approving or dis-
approving proposed discontinuances are subject to judicial review.
See, *e. g., Southern R. Co.* v. *North Carolina,* 376 U. S. 93
(1964).  If, on the other hand, the Commission decides that the
discontinuance is clearly permissible under § 13a of the Act, and
decides not to conduct an investigation or decides to terminate an
investigation already begun, an aggrieved person has no recourse
to the courts to review the Commission's decision.  *New Jersey* v.
*United States,* 168 F. Supp. 324 (NJ 1958), aff'd, 359 U. S. 27
(1959); *City of Chicago* v. *United States,* 396 U. S. 162 (1969).

Thus, if the Commission takes no action on a complaint by a
passenger, under § 13a there is no recourse to the courts.  Only if
the Commission conducts an investigation and issues an order, a
procedure that Congress explicitly eliminated for routes subject to
the Amtrak Act but outside the basic system, is judicial review
available.  It thus appears that the Amtrak Act has in effect sub-
stituted, in matters covered by that statute, the scrutiny of the
Attorney General for that of the Commission under § 13a.  Just as

If the respondent's view of the Act were to prevail, a private plaintiff could secure injunctive process to prevent the discontinuance of an "uneconomic" passenger train *pendente lite,* which would force Amtrak to continue the train's operation and to incur the resulting deficits and dislocations within its entire system while the court considered the propriety of the proposed discontinuance.[10] Since suits could be brought in any district through which Amtrak trains pass and since there would be a myriad of possible plaintiffs, the potential would exist for a barrage of lawsuits that, either individually or collectively, could frustrate or severely delay any proposed passenger train discontinuance. Even if one court eventually upheld the discontinuance, its judgment would not control a suit brought in another district and would not, in any event, obviate the loss in the interim of substantial sums and the diversion of rolling stock from more heavily traveled routes. This would completely undercut the efficient apparatus that Congress sought to provide for Amtrak to use in the "paring of uneconomic routes." It would also produce the anomalous result of a discontinu-

---

an aggrieved passenger has no access to the courts when the Commission, under § 13a, takes no action on a complaint, so likewise under the Amtrak Act an aggrieved passenger has no access to the courts when the Attorney General has refused to object to a proposed passenger train discontinuance by bringing an action under § 307 (a) to enjoin it. There is no reason apparent from the Amtrak Act, its legislative history, or its underlying purposes to think that Congress intended to create a private remedy substantially equivalent to one that had been eliminated under pre-existing federal law.

[10] That this is a very real possibility is demonstrated by Amtrak's experience in *Wood* v. *National Railroad Passenger Corp.,* 341 F. Supp. 908 (Conn. 1972), where the court granted and then extended a temporary restraining order while it considered the merits of a challenge to a proposed discontinuance. The restraining order was dissolved when Amtrak prevailed on the merits.

ance procedure under the Act considerably less efficient than that which existed before, since there would no longer be a single forum that could finally determine the permissibility of a proposed discontinuance. In the place of the state or federal regulatory bodies, the Congress would have substituted any and all federal district courts through whose jurisdictions an Amtrak train might run.

Congress clearly did not intend to replace the delays often inherent in the administrative proceedings contemplated by §13a of the Interstate Commerce Act with the probably even greater delays inherent in multiple federal court proceedings.[11] Instead, it clothed the Attorney General with the exclusive (except in cases involving labor agreements) authority to police the Amtrak system and to enforce the various duties and obligations imposed by the Act. In light of the substantial scrutiny to which Amtrak operations are subject by both Congress and the Executive, Congress could quite rationally suppose that this remedy will effectively prevent and correct any Amtrak breaches of obligations under the Act.[12]

For these reasons we hold that § 307 (a) provides the exclusive remedies for breaches of any duties or obliga-

---

[11] The Amtrak Act was in significant part a response to congressional dissatisfaction with the administrative delays inherent in passenger route discontinuances under existing legislation. As the Senate Report observed, "trains which clearly served no useful purpose were either required to be kept in operation or were allowed to be discontinued only after protracted administrative and judicial proceedings." S. Rep. No. 91–765, p. 2 (1970). It is evident that Congress intended to eliminate the possibility of such "protracted proceedings" from the procedures it created in § 404 of the Act for efficient discontinuance of uneconomic routes.

[12] See 45 U. S. C. § 644, authorizing the Comptroller General to audit Amtrak's books and records, and § 548, requiring periodic reports to Congress and to the President concerning Amtrak's operations.

tions imposed by the Amtrak Act, and that no additional private cause of action to enforce compliance with the Act's provisions can properly be inferred.[13]   Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE POWELL took no part in the consideration or decision of this case.

MR. JUSTICE BRENNAN, concurring in the result.

Although I am in agreement that the legislative history of the Amtrak Act provides a clear and convincing expression of Congress' intent to preclude anyone except the Attorney General and in certain situations an employee or his duly authorized representative from maintaining an action under. the Act against petitioners, I would leave open the question whether a private suit for mandamus under 28 U. S. C. § 1361 might be maintained against the Attorney General if his refusal to act under § 307—even though within the letter of his authority—went "beyond any rational exercise of discretion." *United States ex rel. Schonbrun* v. *Commanding Officer, Armed Forces,* 403 F. 2d 371, 374 (CA2 1968); see Byse & Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv. L. Rev. 308, 333–335 (1967).

---

[13] Since we hold that no right of action exists, questions of standing and jurisdiction become immaterial.   In finding that the respondent had standing, the Court of Appeals relied primarily upon *Data Processing Service* v. *Camp,* 397 U. S. 150 (1970).   In finding jurisdiction, the court relied upon 28 U. S. C. § 1337.

MR. JUSTICE DOUGLAS, dissenting.

discontinuance procedures contained in 49 U. S. C. § 13a. 45 U. S. C. § 501 *et seq.*, authorized the creation of Amtrak to provide intercity rail passage. With "the expectation that the rendering of such [rail] service along certain corridors [could] be made a profitable commercial undertaking," the Act established Amtrak as a private-for-profit corporation. 45 U. S. C. § 541; H. R. Rep. No. 91–1580, p. 1 (1970). Amtrak has until January 1, 1975, to tender a contract to a railroad to release the latter of its entire responsibility for the provision of intercity rail passenger service. 45 U. S. C. § 564 (a). Unless a railroad has a contract with Amtrak to render the service, it may not discontinue intercity passenger service prior to January 1, 1975, "the provisions of any other Act, the laws or constitution of any State, or the decision or order of, or the pendency of any proceeding before, a Federal or State court, agency, or authority to the contrary notwithstanding." *Ibid.* Those intercity services are not yet a part of "the basic system" put together by Amtrak, a system which by § 202 of the Act is unique in the sense that it "shall not be reviewable in any Court." [1] 45 U. S. C. § 522.

Our problem concerns, not "the basic system" created by Amtrak, but what were called on oral argument the "excess" lines that, absent a contract with Amtrak, are

---

[1] Amtrak may eliminate service which is part of the "basic system" only by filing notice with the ICC in accordance with the pre-Act discontinuance procedures contained in 49 U. S. C. § 13a. 45 U. S. C. § 564 (b) (3). Rail service which is undertaken by Amtrak on its own initiative but which is not part of the basic system may be discontinued at any time. 45 U. S. C. § 564 (b) (2). Excess lines, however, even though undertaken by Amtrak on its own initiative become part of the basic system and thus subject to the ICC discontinuance procedures if operated by Amtrak for a continuous period of two years. 45 U. S. C. § 563 (a).

under a congressional mandate not to discontinue "any intercity passenger train whatsoever prior to January 1, 1975." 45 U. S. C. § 564 (a).

The Court phrases the question in terms of whether a "right of action" exists, saying that no question of "standing" or "jurisdiction" is presented. Whatever the merits of the distinction between these three concepts may be in some situations, the difference here is only a matter of semantics. The District Court dismissed the cause for lack of "standing." The Court of Appeals reversed, ruling that there was "standing." The parties argue the case on the basis of "standing." Even the Solicitor General who appeared as *amicus curiae* in support of granting the petition for certiorari conceives of the issue in terms of "standing." By the Court's own admission this is not a case where all judicial review is foreclosed. For § 307 (a), 45 U. S. C. § 547 (a), does create a cause of action. May that cause of action be enforced by passengers or only by the Attorney General or by individual employees or railroad unions? Standing of passengers to sue or the existence of a cause of action in passengers is identical in that posture of the case.

Whatever the semantics, the question is whether respondent, National Association of Railroad Passengers, a national organization of railroad patrons, may bring this action to enjoin the discontinuance by Central of Georgia Railway Co.[2] of passenger trains between

---

[2] Central is a subsidiary of Southern Railway Co. While Central has entered into a contract with Amtrak to relieve it of responsibility for all intercity passenger service, Southern has not. Whether that failure of Southern bars the discontinuance of this passenger-train service goes to the merits of the complaint, was not passed upon below, and has no relevance to the question of standing to sue, the only issue before us.

Savannah and Atlanta, Georgia, and between Albany, Georgia, and Birmingham, Alabama.

Section 307 (a), 45 U. S. C. § 547 (a), gives the Attorney General of the United States and employees under labor agreements the power to obtain from a district court equitable relief against either Amtrak or any railroad acting in violation of the Act.[3] Petitioners argue that § 307 (a) restricts suits to the Attorney General and to employees. That seems a strained construction. The most I think that can be drawn from the words of § 307 (a) and the legislative history is that Congress wanted to make sure that some federal agency had some oversight over the public activity of this private-for-profit corporation. Hence the grant of standing, or cause of action, to the Attorney General. Moreover, it took out of the penumbra of aggrieved persons, employees having rights under collective agreements. Congress left untouched 28 U. S. C. § 1337 which provides that "[t]he district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce . . . ."

---

[3] Title 45 U. S. C. § 547 (a) provides: "If the Corporation or any railroad engages in or adheres to any action, practice, or policy inconsistent with the policies and purposes of this chapter, obstructs or interferes with any activities authorized by this chapter, refuses, fails, or neglects to discharge its duties and responsibilities under this chapter, or threatens any such violation, obstruction, interference, refusal, failure, or neglect, the district court of the United States for any district in which the Corporation or other person resides or may be found shall have jurisdiction, except as otherwise prohibited by law, upon petition of the Attorney General of the United States or, in a case involving a labor agreement, upon petition of any employee affected thereby, including duly authorized employee representatives, to grant such equitable relief as may be necessary or appropriate to prevent or terminate any violation, conduct, or threat."

Aggrieved passengers are the most obvious complainants when it comes to saving passenger trains from extinction. Certainly passengers of discontinued trains suffer injury in fact and are within the zone of interests protected by the Amtrak Act and thus satisfy two of the three requirements of *Data Processing Service* v. *Camp,* 397 U. S. 150. As to the third—that judicial review has not been precluded—it seems as plain to me as it did to the Court of Appeals. Where as here there is no express denial of judicial review, the test is whether "nonreviewability can fairly be inferred." *Barlow* v. *Collins,* 397 U. S. 159, 166. And, since judicial review "is the rule, and nonreviewability an exception which must be demonstrated," preclusion of judicial review "is not lightly to be inferred." *Ibid.* "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 141.

The grant of jurisdiction to the Attorney General to screen state voting right procedures that might have a discriminatory effect did not, we held in *Allen* v. *State Board of Elections,* 393 U. S. 544, deprive individual citizens of standing to sue.

> "The achievement of the Act's laudable goal could be severely hampered, however, if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General. For example, the provisions of the Act extend to States and the *subdivisions thereof.* The Attorney General has a limited staff and often might be unable to uncover quickly new regulations and enactments passed at the varying levels of state government. It is consistent with the broad purpose of the Act to allow the individual citizen standing to insure that his city or county government complies with the § 5 approval requirements." *Id.,* at 556–557 (footnotes omitted).

The Attorney General is a busy person; and it is not credible to believe that a grant of power to him to sue precludes the standing of passengers who are the prime casualties when passenger service is discontinued.

Each case involving the availability of judicial review stands on its own feet. In *Switchmen's Union* v. *National Mediation Board,* 320 U. S. 297, we denied judicial review since the collective-bargaining right was being protected by a neutral agency, the National Mediation Board. There is no such body standing between the passengers and Amtrak. Amtrak is a private-for-profit corporation which is only construing its own enabling Act. If passengers are denied standing to sue, Amtrak is largely on its own. Especially is this so in light of the Attorney General's own view that the grant of power in § 307 (a) is limited and does not authorize him to seek correction of all violations of the Act.[4] So far as I can ascertain the Attorney General has not intruded in any case.[5] To leave the complete over-

---

[4] In refusing to become involved in the case consolidated with this one in the Court of Appeals, the Attorney General's Office expressed the view that "the statutory mandate of section 307 (a) [45 U. S. C. § 547 (a)] does not give the Attorney General the authority to sue for a construction of the Act or to enjoin a purely technical violation." Letter from Assistant Attorney General L. Patrick Gray III to Congressman John Slack, Nov. 19, 1971, in Brief for Respondent 29, 30.

[5] As the Court of Appeals noted, the petitioners "have been unable to refer us to a single instance in which the Attorney General has either instigated or participated in litigation under the Amtrak Act, except for a few cases brought by other parties in which he intervened solely to support the defense that parties other than labor and the Attorney General did not have standing to sue." *Potomac Passengers Assn.* v. *Chesapeake & Ohio R. Co.,* 154 U. S. App. D. C. 214, 227, 475 F. 2d 325, 338 (1973). On oral argument respondent informed us of two instances in which it obtained injunctive relief against rail service discontinuance after the Attorney General declined to act.

sight to employees is to make nonreviewable most of Amtrak's decisions. Congress specifically did that when it came to "the basic group" of carriers. But its mandate not to discontinue passenger service until January 1, 1975, except on a contract with Amtrak is clear. If in that interim there can be no policing of the Act, we have given a corporation which is private and operating for a profit, an administrative absolution we seldom have been willing to conclude that Congress has bestowed even on federal agencies. I cannot believe the Congress had any such purpose.

We deal here with a federal cause of action and it is the judicial tradition "for federal courts to fashion federal law where federal rights are concerned." *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448, 457. The fact that a private suit to enforce a federal law is not specifically sanctioned by Congress seldom means that standing to sue is foreclosed. The purpose of the Amtrak Act was to preserve and improve train service. The object was not to protect trains *per se* nor to create an *in rem* action. The purpose, which the Court in its dedication to legalisms overlooks, was to protect the people who ride the trains. The case is very much on all fours with *J. I. Case Co.* v. *Borak,* 377 U. S. 426, where Congress made it unlawful to solicit proxies in violation of rules prescribed by the Securities and Exchange Commission. No standing, no cause of action was expressly given stockholders who might suffer from corporate action pursuant to a deceptive proxy solicitation. Yet we held that the Commission was not granted an exclusive role to play in policing the area:

> "Private enforcement of the proxy rules provides a necessary supplement to Commission action. As in antitrust treble damage litigation, the possibility of civil damages or injunctive relief serves as a most

effective weapon in the enforcement of the proxy requirements. The Commission advises that it examines over 2,000 proxy statements annually and each of them must necessarily be expedited. Time does not permit an independent examination of the facts set out in the proxy material and this results in the Commission's acceptance of the representations contained therein at their face value, unless contrary to other material on file with it." *Id.*, at 432.

The Court is in the mood to close all possible doors to judicial review so as to let the existing bureaucracies roll on to their goal of administrative absolutism. When the victims of administrative venality or administrative caprice are not allowed even to be heard, the abuses of the monsters we have created will become intolerable. The separation of powers was designed to provide, not for judicial supremacy, but for checks and balances. When we turn back this respondent, we turn back passengers who are the victims of the present transportation debacle. Those who complain are not adventurers who seek personal aggrandizement as do jackals who historically have fattened on some economic debacles. The passengers are the victims of the transportation crisis out of which Amtrak seeks to make a fortune. These passengers should be heard. They satisfy the stringent test we laid down in *Baker* v. *Carr*, 369 U. S. 186; they have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues . . . ." *Id.*, at 204.

I would affirm the judgment of the Court of Appeals whether the rationalization be based on standing, cause of action, or jurisdiction.