KEAUKAHA–PANAEWA COMMUNITY ASSOCIATION, Keaukaha-Panaewa Farmers Association, Isabel Leinani Knutson, Erma Kalanui and April Kamakaokalanimalunao'e Kalanui, by her guardian ad litem, Erma Kalanui, Individually and on behalf of all persons similarly situated, Plaintiffs-Appellees,

v.

HAWAIIAN HOMES COMMISSION, Bille Beamer, in her capacity as Chairman of the Hawaiian Homes Commission, the Department of Hawaiian Home Lands, Defendants-Appellants,

and

County of Hawaii, Edward Harada, in his capacity as Chief Engineer, County of Hawaii, Defendants,

and

James W. Glover, LTD., a Hawaii Corporation, Defendant.

No. 77–1044.

United States Court of Appeals, Ninth Circuit.

Sept. 18, 1978.

As Amended on Denial of Rehearing and Rehearing En Banc Jan. 9, 1979.

George K. K. Kaeo, Jr., Deputy Atty. Gen. (argued), Honolulu, Hawaii, for defendants-appellants.

Ben H. Gaddis (argued), Hilo, Hawaii, for plaintiffs-appellees.

George R. Hyde, Atty., Washington, D. C., for amicus curiae.

Before CHAMBERS, WALLACE, and ANDERSON, Circuit Judges.

WALLACE, Circuit Judge:

Agencies of the State of Hawaii appeal from a judgment of the district court that the agencies have violated their obligations in connection with certain lands held in trust by the State of Hawaii for the benefit of native Hawaiians. This appeal raises complex jurisdictional and jurisdiction-related issues. We reverse.

I

In 1921, Congress enacted the Hawaiian Homes Commission Act (Commission Act), 42 Stat. 108, which created the Hawaiian Homes Commission (Commission) and designated some 200,000 acres (the Hawaiian home lands) for the welfare and rehabilitation of native Hawaiians. The Commission Act empowers the Commission to lease parcels of land within its jurisdiction to native Hawaiians at nominal rates. Although the

underlying purpose of the statute has been questioned, it was ostensibly designed to rehabilitate the declining indigenous Hawaiians by facilitating their access to farm and homestead lands. *See* Levy, *Native Hawaiian Land Rights*, 63 Cal.L.Rev. 848, 865–66, 876–80 (1975).

With the admission of Hawaii into the Union in 1959, responsibility for the administration of the Hawaiian home lands was transferred to the state. Section 4 of the Hawaii Admission Act, Pub.L. No. 86–3, 73 Stat. 5 (1959) provides:

As a compact with the United States relating to the management and disposition of the Hawaiian home lands, the Hawaiian Homes Commission Act, 1920, as amended, shall be adopted as a provision of the Constitution of said State

. . . .

In addition, the Admission Act conveyed the United States' title to the Hawaiian home lands to the state, *id.* at § 5(b),[1] and requires Hawaii to hold these lands "as a public trust . . . for the betterment of the conditions of native Hawaiians . . . and their use for any other object shall constitute a breach of trust for which suit may be brought by the United States. *Id.* at § 5(f).[2]

1. Section 5(b) provides:

 Except as provided in subsection (c) and (d) of this section, the United States grants to the State of Hawaii, effective upon its admission into the Union, the United States' title to all the public lands and other public property, and to all lands defined as "available lands" by section 203 of the Hawaiian Homes Commission Act, 1920, as amended, within the boundaries of the State of Hawaii, title to which is held by the United States immediately prior to its admission into the Union. The grant hereby made shall be in lieu of any and all grants provided for new States by provisions of law other than this Act, and such grants shall not extend to the State of Hawaii.

2. Section 5(f) provides:

 The lands granted to the State of Hawaii by subsection (b) of this section and public lands retained by the United States under subsections (c) and (d) and later conveyed to the State under subsection (e), together with the proceeds from the sale or other disposition of any such lands and the income therefrom, shall be held by said State as a public trust

for the support of the public schools and other public educational institutions, for the betterment of the conditions of native Hawaiians, as defined in the Hawaiian Homes Commission Act, 1920, as amended, for the development of farm and home ownership on as widespread a basis as possible for the making of public improvements, and for the provision of lands for public use. Such lands, proceeds, and income shall be managed and disposed of for one or more of the foregoing purposes in such manner as the constitution and laws of said State may provide, and their use for any other object shall constitute a breach of trust for which suit may be brought by the United States. The schools and other educational institutions supported, in whole or in part out of such public trust shall forever remain under the exclusive control of said State; and no part of the proceeds or income from the lands granted under this Act shall be used for the support of any sectarian or denominational school, college, or university.

This provision contains an ambiguity since it arguably provides that the Hawaiian home

In accordance with section 4 of the Admission Act, the Commission Act was adopted as a provision of Hawaii's constitution, Hawaii Const. art. XI, and was thereafter deleted from the United States Code, although it was not formally repealed.

In the early 1970s, the County of Hawaii proposed the construction of a flood-control project in the Waiakea-Uka area. Because the proposed project was to be constructed on approximately 12 acres of Hawaiian home lands, the County presented its proposal to the Commission. The Commission apparently concluded that the project would alleviate flood problems experienced by some of its lessees in the Panaewa area and accordingly approved the project. On this basis, the Commission agreed to convey the 12 acres of affected home lands to the County in exchange for equivalent acreage of county land.[3]

In January 1975, construction began on the proposed flood-control project. Shortly thereafter the County determined that the survey on which the project was based was inaccurate and that as a result an additional 5.5 acres of home lands would be required. It is now undisputed that the entire project, if completed, will require approximately 25.5 acres of Hawaiian home lands. It is also undisputed that no lands have been exchanged in order to compensate the Commission for the home lands used in the project.

In July 1975, a group of native Hawaiians (plaintiffs) brought this action against the Commission, the County, and various individuals involved with the construction of the Waiakea-Uka Project, seeking declaratory and injunctive relief. The plaintiffs are all lessees of Hawaiian home lands in the Panaewa area or are qualified applicants for such leases.

Plaintiffs asserted five distinct claims each of which is premised on either the Admission Act or the Commission Act. First, plaintiffs claim that the Commission has violated section 204(4) of the Commission Act by agreeing to exchange lands for a purpose other than those permitted by the Act.[4] Second, plaintiffs claim that the Commission has violated section 204(4) by permitting the County to render home lands useless for their designated purpose without first receiving title to lands received in compensation. Third, plaintiffs claim that the Commission violated section 204(4) by failing to obtain the consent of the Governor and Secretary of Interior for the proposed exchange. Fourth, plaintiffs allege that the project is "illegal" because it will consume twice the amount of home lands originally approved by the Commission.[5] Finally, plaintiffs claim that the Commission has violated fiduciary obligations imposed upon it by sections 4 and 5 of the Admission Act.

The Commission moved to dismiss the action on the ground that it does not "arise

lands may be used for the same general public purposes as other federal lands conveyed to Hawaii pursuant to the Admission Act. For purposes of this case, however, we accept as true plaintiffs' assertion that the home lands may still lawfully be used only in the manner set forth in the Commission Act.

3. In 1954 Congress amended section 204(4) of the Commission Act to permit the Commission, under certain circumstances, to exchange property within its jurisdiction for lands of equal value. Section 204(4) reads in part:

The Commission may, with the approval of the Governor and the Secretary of the Interior, in order to consolidate its holdings or to better effectuate the purposes of this Act, exchange the title to available lands for land, publicly owned, of an equal value.

Act of June 18, 1954, ch. 319, 68 Stat. 262 (1954).

4. Section 204(4), by its terms, only permits land exchanges designed "to consolidate [the Commission's] holdings or to better effectuate the purposes of th[e] Act . . . ." See note 3, supra.

Plaintiffs assert that an exchange of lands to make possible the project, which is designed primarily to serve the City of Hilo, furthers neither of the permissible goals.

5. Plaintiffs' general assertion that the project is "illegal" makes precise jurisdictional analysis very difficult. We think it clear from the entire complaint, however, that this claim too was premised on the Commission Act and the Admission Act. Therefore, the "federal question" and "cause of action" analysis in the subsequent text are fully applicable to this claim.

under the Constitution, laws or treaties of the United States." *See* 28 U.S.C. § 1331(a); U.S.Const. art. III, § 2. The district judge denied the motion and held that because both the Commission Act and the Admission Act are federal statutes, federal question jurisdiction would exist as to each claim.

In September 1976, the district judge granted plaintiffs' motion for summary judgment on their second, third, fourth and fifth claims. The district judge ordered the Commission and the other defendants to "complete a land exchange as soon as reasonably possible in compliance with § 204(4)" of the Commission Act. The defendants were also enjoined from "using" the Waiakea-Uka Flood Control Project until the district court had approved a land exchange schedule.

On appeal, the Commission renews its jurisdictional arguments and also attacks the merits of the district court's ruling. Because of the unique and substantial nature of the jurisdictional questions, we requested the Department of Justice to present its views as amicus curiae.

The problem which the parties and amicus have treated under the general heading of jurisdiction really involves two discrete issues: whether there exists (1) a private cause of action, and (2) federal question jurisdiction. The Supreme Court recently explained the distinct nature of these separate inquiries in *National Railroad Passenger Corp. v. National Ass'n of Railroad Passengers*, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974) (*Amtrak*):

> In this Court and in the Court of Appeals, the parties have approached the question from several perspectives. The issue has been variously stated to be whether the Amtrak Act can be read to create a private right of action to enforce compliance with its provisions; whether a federal district court has jurisdiction under the terms of the Act to entertain such a suit; and whether the respondent has standing to bring such a suit. . . . [T]he threshold question clearly is whether the Amtrak Act or any other provision

of law creates a cause of action whereby a private party . . . can enforce duties and obligations imposed by the Act; for it is only if such a right of action exists that we need consider whether the respondent had standing to bring the action and whether the District Court had jurisdiction to entertain it.

*Id.* at 455–56, 94 S.Ct. at 692.

■ Based upon *Amtrak*, therefore, our threshold inquiry is whether the Commission Act and the Admission Act create private causes of action for enforcement of their terms. Only if such a right of action exists need we determine whether the district court had jurisdiction. We hold that the Admission Act does not provide a private right of action and we therefore do not reach the jurisdictional issue as to the Admission Act claims. We do consider this subsequent issue as regards the claims alleged to arise under the Commission Act, but conclude that the district court was without jurisdiction. We therefore reverse.

## II

We turn first to plaintiffs' claims which are based on the trust language of sections 4 and 5 of the Admission Act. Section 5 expressly provides that the improper use of Hawaiian home lands "shall constitute a breach of trust for which suit may be brought by the United States." The Act is silent, however, on the question of whether suit may be brought by a private individual to enforce its terms. Thus, the threshold question is squarely presented: Does the Admission Act create an implied cause of action by which a private party may enforce the duties and obligations imposed by the Act? The Supreme Court has recently decided a series of cases which guide us to the proper resolution of this question.

## A

In *Amtrak, supra*, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646, an association of railroad passengers challenged the discontinuance of certain passenger lines as violative of the Rail Passenger Service Act. In

reaching its conclusion that the Act does not imply a private cause of action of this type, the Court focused principally on the fact that the Act specifically permits enforcement suits by the Attorney General or, in cases involving a labor agreement, by employees. It was argued that the authorization of the public cause of action and the very narrow private right of action "should not be read to *preclude* other private causes of action for the enforcement of obligations imposed by the Act." *Id.* at 457, 94 S.Ct. at 693. Since the action was brought by the intended beneficiaries of the Act, it was contended that the Court should therefore imply a private cause of action in their favor. The Court disagreed, reasoning

> that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute · to subsume other remedies. "When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." This principle of statutory construction reflects an ancient maxim—*expressio unius est exclusio alterius.* Since the Act creates a public cause of action for the enforcement of its provisions and a private cause of action only under very limited circumstances, this maxim would clearly compel the conclusion that the remedies created in § 307(a) are the exclusive means to enforce the duties and obligations imposed by the Act.

*Id.* at 458, 94 S.Ct. at 693 (citation omitted).

■ Although the Court carefully stated that the *expressio unius* principle would "yield to clear contrary evidence of legislative intent," *id.* at 458, 94 S.Ct. at 693, *Amtrak* clearly indicates that in cases where a statute provides only for a public or very narrow private cause of action, there is at least a rebuttable presumption that the legislature did not intend to grant a general, private enforcement cause of action. *See Girardier v. Webster College*, 563 F.2d 1267, 1276–77 (8th Cir. 1977); *Olsen v. Shell Oil Co.*, 561 F.2d 1178, 1184 n.5 (5th Cir. 1977); *Cannon v. University of Chicago*, 559 F.2d 1063, 1074 & n.14 (7th Cir.

1976), *cert. granted,* —— U.S. ——, 98 S.Ct. 3142, 57 L.Ed.2d 1159 (1978); *Goldman v. First Fed. Savings & Loan*, 518 F.2d 1247, 1250 n.6 (7th Cir. 1975); Note, *Implied Private Actions Under Federal Statutes—The Emergence of a Conservative Doctrine*, 18 Wm. & Mary L.Rev. 429, 438 (1976).

In addition to the *expressio unius* and legislative intent criteria, the Court in *Amtrak* also stated that the implication of a private cause of action "must be consistent . . . with the effectuation of the purposes intended to be served by the Act." *Amtrak, supra*, 414 U.S. at 458, 94 S.Ct. at 693.

In *Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975) (*SIPC*), the Court reaffirmed the analysis it had recently adopted in *Amtrak*. In *SIPC*, the Court framed the issue as whether customers of a financially troubled securities broker "have an implied private right of action under the Securities Investor Protection Act of 1970" to compel the Securities Investor Protection Corporation "to exercise its statutory authority for their benefit." *Id.* at 413–14, 95 S.Ct. at 1735. The Act expressly provided for such enforcement actions by the SEC.

The Court held that the Act did not imply a private cause of action for enforcement of its terms. In reaching its decision, the Court relied almost exclusively on *Amtrak*. Most significantly, the Court reaffirmed that the express provision for a public cause of action "ordinarily implies that no other means of enforcement was intended by the Legislature." *Id.* at 419, 95 S.Ct. at 1738.

Reemphasizing the additional criteria it had used in *Amtrak*, the Court also explained that the inference drawn from the structure of the Act would yield to clear extrinsic evidence that Congress intended a private cause of action and that any implied right of action must be compatible with the scheme and purpose of the Act. *Id.* at 420–21, 95 S.Ct. 1738.

In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Court considered "whether a private cause of action [was] to

be implied in favor of a corporate stockholder under 18 U.S.C. § 610, a criminal statute prohibiting corporations from making 'a contribution or expenditure in connection with any election at which Presidential and Vice Presidential Electors . . . are to be voted for.' " *Id.* at 68, 95 S.Ct. at 2083. In concluding that such a private right of action was not implied, the Court identified four "factors" to be examined in determining whether implication of a private right of action is appropriate.

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," . . .—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, *e. g., National Railroad Passenger Corp. v. National Ass'n of Railroad Passengers,* 414 U.S. 453, 458, 460, 94 S.Ct. 690, 693, 694, 38 L.Ed.2d 646 (1974) (*Amtrak*). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. at 2088 (citations omitted).

This formulation is superficially in accord with *Amtrak* and *SIPC.* The citation to *Amtrak* following the second criterion suggests that the *expressio unius* inference is an acceptable manner of ascertaining "implicit" legislative intent. In a footnote, however, the Court left uncertain the vitality of the *expressio unius* inference approved in *Amtrak* and *SIPC.*

In *Cort,* it was argued that the Federal Election Campaign Act of 1971 had created private remedies for violations of its disclosure provisions and had amended section 610 without providing a parallel private remedy. Thus, it was contended, *Amtrak* required the inference of legislative intent

not to provide a private remedy for section 610. The Court rejected this argument, distinguishing *Amtrak* primarily on the ground that in *Amtrak* "there was specific support in the legislative history of the Amtrak Act for the proposition that the statutory remedies were to be exclusive." *Id.* at 82–83 n.14, 95 S.Ct. at 2090. Thus, *Cort* suggests that the *expressio unius* inference is only permissible when supported by legislative history. This suggestion, however, apparently conflicts with *Amtrak's* teaching that this inference is operative *unless* contradicted by "clear contrary evidence of legislative intent." *Amtrak, supra,* 414 U.S. at 458, 94 S.Ct. at 693.

Although *Cort* may be read as rejecting the *Amtrak* approach, *see* Note, *Implied Private Actions Under Federal Statutes—The Emergence of a Conservative Doctrine,* 18 Wm. & Mary L.Rev. 429, 453 (1976), we believe *Amtrak* remains important for our analysis of the case before us. First, the Court distinguished *Amtrak* rather than reject it. Therefore, in cases which do not share the same bases for distinction, *Amtrak* remains a controlling precedent. Second, we are guided by the fact that other circuits have continued after *Cort* to afford some, albeit differing, weight to the *Amtrak* approach. *See Girardier v. Webster College, supra,* 563 F.2d at 1276–77 (where enforcement of statute is entrusted to Secretary of HEW, "no private cause of action arises by inference"); *Olsen v. Shell Oil Co., supra,* 561 F.2d at 1188 (*Amtrak* "modif[ied] . . . somewhat" by *Cort*). In short, we agree with the conclusion of the Seventh Circuit in *Cannon v. University of Chicago, supra,* 559 F.2d 1063:

> The teaching of *Amtrak, SIPC* and *Cort, supra,* is that a private cause of action should not be lightly implied under a statute where Congress has not specifically provided one—especially where Congress has provided for other means of enforcement.

*Id.* at 1074 (footnote omitted).[6] Whatever the impact of *Cort* may be, the *Amtrak*

---

**6.** Apparently, our court has employed the *Cort* test three times in determining whether a certain statute implies a private right of action. *See Starbuck v. City & County of San Francis-*

inference is at least one factor which, in appropriate cases, may properly go into the crucible for resolving the implication issue.

### B

■ The first of the *Cort* criteria is that the plaintiff must be a member of the "class for whose *especial* benefit the statute was enacted . . . ." 422 U.S. at 78, 95 S.Ct. at 2088. Of course, the trust provision of section 5(f) of the Admission Act pertains to all public Hawaiian land and not just to the home lands. In that sense, the provision does not benefit any class narrower than all citizens of Hawaii. It is clear, however, that the home lands were to continue to be used for the benefit of native Hawaiians as defined by the Commission Act. Therefore, the trust provision, as applied to the home lands, is intended especially to benefit native Hawaiians. Since plaintiffs are clearly members of this group, the first element of the *Cort* test is satisfied.

The second element of the *Cort* test, "explicit or implicit" legislative intent, cuts against implication of a private cause of action here. Our review of the legislative history of the Admission Act, *see* S.Rep. No.80, 86th Cong., 1st Sess., Appendix C (1959), *reprinted in* [1959] U.S.Code Cong. & Admin.News, pp. 1346, 1403, has not discovered any indication that Congress intended to created a private cause of action via the Admission Act nor has any such indication been pointed out to us. Indeed, the rare references in the Committee reports to enforcement of section 5's trust provisions refer exclusively to the public cause of action. *See, e. g.*, S.Rep.No.1164, 85th Cong., 1st Sess. 14 (1957). This does not surprise us, however. It would be unusual for Congress to employ a state's admission act to create private enforcement rights, and it is inconceivable that Congress would intend to do so implicitly.

At this point, of course, the *Amtrak* presumption enters our analysis. Although the

uncertainties of the *Cort* decision counsel against heavy reliance on this presumption, as we explained above, it remains a relevant factor in cases such as this. We think the particular history of the Admission Act renders it most appropriate for application of the *expressio unius* presumption:

> The first Hawaii statehood bill was introduced in the 65th Congress in 1919. Hearings began 25 years ago with those on H.R. 3034, 74th Congress.
>
> Since then, the House and Senate have held 22 additional hearings on the subject of statehood for Hawaii. The record on the question comprises more than 6,600 printed pages of testimony and exhibits. More than 850 witnesses have been heard in the Territory and in Washington. Seven of the hearings have been held in Hawaii (1935, 1937, 1946, 1948, 1954, and 1958). In addition, at least 12 reports have been made.
>
> The question of admitting Hawaii to statehood has been longer considered and more thoroughly studied than any other statehood proposal that has ever come before Congress. Thirty-seven States have previously been admitted to the Union by action of Congress, yet in no single case has there been such a thoroughly careful study of the qualifications of the applicant as in the case of Hawaii.

S.Rep.No.80, 86th Cong., 1st Sess. (1959), *reprinted in* [1959] U.S.Code Cong. & Admin.News, pp. 1346, 1349–50.

■ The *expressio unius* principle is based on a presumption that by providing a specific remedy, Congress intended to exclude others. Reason dictates that the more thoroughly a bill is considered, the greater the likelihood that the *expressio unius* presumption accurately reflects reality. Since in this case, the legislative measure was given protracted consideration, it is more likely that the lack of an express private cause of action was intentional. Given this consideration, and finding no

*co*, 556 F.2d 450 (9th Cir. 1977); *Kipperman v. Academy Life Ins. Co.*, 554 F.2d 377 (9th Cir. 1977); *Harmsen v. Smith*, 542 F.2d 496 (9th

Cir. 1976). In none of these cases, however, were we required to consider the impact of *Cort* on the *Amtrak* approach.

contrary evidence, the express provision for the public cause of action permits us, on authority of *Amtrak* and *SIPC*, to infer that Congress did not intend to create a private right of action.

■ The third of the *Cort* elements is that an implied cause of action must be consonant with the general scheme and purposes of the statute. Although this is a close question in this case, we think this criterion tends to militate against implication. Clearly, the Admission Act was intended to transfer complete ownership and responsibility of the Commission Act program and the home lands to Hawaii. Since, as this case demonstrates, disputes pertaining to this program involve purely Hawaiian officials, citizens, and lands, we see no federal purpose to be served by reading a private cause of action into the Admission Act. Absent a Federal constitutional violation, we rely upon the laws and institutions of Hawaii to protect its native citizens and assure the proper use of state-owned lands, subject only to the public enforcement right expressly contained in the Act.

Turning to the final *Cort* criterion, we easily conclude that the cause of action at issue here is "one traditionally relegated to state law, in an area basically the concern of [Hawaii] . . . ." 422 U.S. at 78, 95 S.Ct. at 2088. With Hawaii's admission into the Union, the national government virtually relinquished its control over and interest in the Hawaiian home lands. The problem described in plaintiffs' complaint is essentially a matter of state concern. We deem it most appropriate for Hawaii's laws and judicial system to deal with it.

These factors concertedly and decidedly militate against implication of the private enforcement cause of action. Therefore, plaintiffs' Admission Act claims must be dismissed.[7]

### III

Plaintiffs' claims which are premised on the Commission Act raise the same problems as do their Admission Act claims; the Commission Act similarly does not expressly provide for a private right of action to enforce its terms. However, we choose not to confront this difficult question because even assuming a private right of action, a suit based upon the Commission Act claims faces a discrete and equally lethal potential obstacle: federal subject matter jurisdiction. We conclude that the district court was without jurisdiction to hear these claims; we therefore reverse.[8]

---

7. Plaintiffs contend that, as native Hawaiians, they should receive the benefit of cases that have allowed native Americans (American Indians) a private federal right of action where the United States, as trustee, could sue in federal district court to protect the native Americans' rights with regard to trust lands. *See, e.g., Agua Caliente Band of Mission Indians v. County of Riverside,* 442 F.2d 1184, 1186 (9th Cir. 1971), *cert. denied,* 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 890 (1972). We developed this "co-plaintiff" doctrine in reliance upon *Poafpybitty v. Skelly Oil Co.,* 390 U.S. 365, 366–72, 88 S.Ct 982, 19 L.Ed.2d 1238 (1968), which held that "[a]n Indian, as the beneficial owner of lands *held by the United States in trust* has a right acting independently of the United States to sue to protect his property interests." *Agua Caliente Band of Mission Indians v. County of Riverside, supra,* 442 F.2d at 1186 (emphasis added) (footnote omitted).

The argument in favor of a private right of action in federal court pursuant to the "co-plaintiff" doctrine is of less force in the situation before us. The factual circumstances underlying the line of cases establishing this doctrine generally involve native Americans, as plaintiffs, suing a state or other entity to protect their rights in trust property, where the United States is trustee of the lands. In this case, however, the state is the trustee, the native Hawaiians are attempting to sue the state for breach of the state's trust obligations, and the United States has the opportunity to sue the state only on the basis of a right reserved by Congress in the state's Admission Act. The United States has only a somewhat tangential supervisory role under the Admission Act, rather than the role of trustee.

8. Although the Supreme Court in *Amtrak* did refer to the implication issue as "the threshold question," 414 U.S. at 456, 94 S.Ct. 690, we think it preferable to reach first the jurisdictional issue with respect to the Commission Act claims. First, the jurisdictional issue is also a threshold one in that it too *must* be satisfied before we can proceed to the merits. More important, because we are without jurisdiction, it would be unwise needlessly to express an opinion on a difficult question— whether the Commission Act implies a private

Plaintiffs argue that the district court had subject matter jurisdiction over the Commission Act claims pursuant to 28 U.S.C. § 1331(a). Section 1331(a) provides in part:

> The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000 . . . and arises under the Constitution, laws, or treaties of the United States. . . .

The crucial question here, of course, is whether plaintiffs' Commission Act claims "arise under" the laws of the United States.

The issue of whether or not a particular case arises under federal law is perhaps "the most difficult single problem in determining whether the federal jurisdiction exists." *Smith v. Grimm,* 534 F.2d 1346, 1350 (9th Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976), *quoting* C. Wright, A. Miller, & E. Cooper, 13 Federal Practice & Procedure 397 (1975). Although the Supreme Court has rendered several relevant decisions,[9] these cases do not fit snugly into a single, logical mosaic.

Beginning with *Osborn v. Bank of United States,* 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824), the courts have endeavored, from time to time, to develop an all-encompassing rule to be applied to determine if a case arises under federal law. Chief Justice Marshall looked to whether the federal law is the "original ingredient" of the action. *Id.* at 824. Perhaps the next most famous was Mr. Justice Holmes' formulation that "[a] suit arises under the law that creates the cause of action." *American Well Works Co. v. Layne & Bowler Co.,* 241 U.S. 257, 260, 36 S.Ct. 585, 586, 60 L.Ed. 987 (1916).

None of the definitions found seem to have universal application. Perhaps the most thoughtful distillation was developed by Professor Paul Mishkin when he concluded that original federal jurisdiction requires "a substantial claim founded 'directly' upon federal law." Mishkin, *The Federal "Question" in the District Courts,* 53 Col.L.Rev. 157, 165, 168 (1953).

Fortunately, however, it is unnecessary for us to go beyond the facts of this case. In *Gully v. First Nat'l Bank,* 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936), the Supreme Court comprehensively reviewed its prior decisions and provided an analysis which is determinative of the case before us.

In *Gully,* a state tax collector brought suit in state court to collect a state tax levied against a national bank. The bank removed the case to federal court. On appeal, the Fifth Circuit upheld the district court's assertion of jurisdiction "upon the ground that the power to lay a tax upon the shares of national banks has its origin and measure in the provisions of a federal statute . . . ." *Id.* at 112, 57 S.Ct. at 97.

The Supreme Court reversed. Mr. Justice Cardozo, writing for a unanimous court, analyzed the problem as follows:

> Not every question of federal law emerging in a suit is proof that a federal law is the basis of the suit. The tax here in controversy if valid as a tax at all, was imposed under the authority of a statute of Mississippi. The federal law did not attempt to impose it or to confer upon the tax collector authority to sue for it. True, the tax, though assessed through the action of the state, must be consistent with the federal statute consenting, subject to restrictions, that such assessments may be made. . . . If there were no federal law permitting the taxation of shares in national banks, a suit to recover such a tax would not be one arising under the Constitution of the United States, though the bank would have the aid of the Constitution when it came to its defense. That there *is* a federal law permitting such taxation does not change the basis of the suit, which is still the statute of the state, though the federal law is evidence to prove the statute valid.

---

right of action—which may ultimately be presented in the proper forum, a state court.

**9.** *See* C. Wright, A. Miller & E. Cooper, 13 Federal Practice and Procedure § 3562 (1975); Mishkin, *The Federal "Question" in the District Courts,* 53 Col.L.Rev. 157 (1953); Cohen, *The Broken Compass: The Requirement That A Case Arise "Directly" Under Federal Law,* 115 U.Pa.L.Rev. 890 (1967).

. . . We recur to the test announced in *Puerto Rico v. Russell & Co., supra:* "The federal nature of the right to be established is decisive—not the source of the authority to establish it." Here the right to be established is one created by the state. If that it so, it is unimportant that federal consent is the source of state authority. To reach the underlying law we do not travel back so far.

*Id.* at 115–16, 57 S.Ct. at 99 (citations omitted).

In the case before us, plaintiffs argue that the Commission Act created the rights which they seek to vindicate and, since the Act was never formally repealed by Congress, these claims arise under a federal law. Although this argument bears a degree of logical and technical appeal, we think it ignores the practical realities of the situation. Its adoption would require us to reject Mr. Justice Cardozo's counsel:

> To define broadly and in the abstract "a case arising under the Constitution or laws of the United States" has hazards of a kindred order. What is needed is something of that *common-sense* accommodation of judgment to kaleidoscopic situations which characterizes the law in its treatment of problems of causation. One could carry the search for causes backward, almost without end. . . . Instead, there has been a selective process which picks the substantial causes out of the web and lays the other ones aside. As in problems of causation, so here in the search for the underlying law. If we follow the ascent far enough, countless

claims of right can be discovered to have *their source or their operative limits in the provisions of a federal statute* or in the Constitution itself with its circumambient restrictions upon legislative power. To set bounds to the pursuit, the courts have formulated the distinction between controversies that are basic and those that are collateral, between disputes that are necessary and those that are merely possible. We shall be lost in a maze if we put that compass by.[10]

*Id.* at 117–18, 57 S.Ct. at 100 (citations omitted; emphasis added). We have followed Mr. Justice Cardozo's "common-sense" admonition. *See League to Save Lake Tahoe v. B.J.K. Corp.,* 547 F.2d 1072, 1074 (9th Cir. 1976).

 The Commission Act, as originally enacted, created certain benefits for native Hawaiians. It is clear, however, that for all practical purposes these benefits have lost their federal *nature.* Upon admission of Hawaii into the Union, the entire Commission Act program was turned over to the State of Hawaii. The United States conveyed its interest in the home lands (which are the subject of the Commission Act) to the state and these lands are now administered by state officials. The Commission Act itself was deleted from the United States Code and, at Congress' insistence, was adopted as a permanent fixture of the state's constitution. Thus, it is undisputable that the Commission Act program together with its rights and duties are, for all practical purposes, elements of Hawaiian law.[11] In essence, this is an ac-

---

**10.** This statement has been criticized as an inadequate test so long as the court will only look at the complaint in making its determination. Chadbourn & Levin, *Original Jurisdiction of Federal Questions,* 90 U.Pa.L.Rev. 639, 670–71 (1942).

**11.** We acknowledge the argument that if the Commission Act is still also federal law, there may exist two independent sources for plaintiffs' claims, one state and the other federal. Therefore, the argument goes, since plaintiffs may determine on which law they base their claims, *Bell v. Hood,* 327 U.S. 678, 681, 66 S.Ct. 773, 90 L.Ed. 939 (1946), their reliance upon the

federal statute confers "federal question" jurisdiction.

It is clear, however, that even though a federal statute expressly grants a specific right of action, the case will not necessarily be deemed to arise under federal law if the resolution of the case will depend wholly on issues of state law. *Shoshone Mining Co. v. Rutter,* 177 U.S. 505, 20 S.Ct. 726, 44 L.Ed. 864 (1900). In addition, even assuming that plaintiffs' claims have a federal *source,* it is the state *nature* of the claims which, as we explain in the text, resolves the jurisdictional issue. If we were to hold that the Commission Act claims arise under federal law solely because of their origin in

tion brought against state officers to compel them to administer state lands in conformance with the state constitution. These facts make it clear that the rights plaintiffs seek to vindicate are state rights by *nature.* Even though the historical source of these rights was a federal statute, it is the clear state *nature* of the rights which governs our decision. *Gully v. First Nat'l Bank, supra,* 299 U.S. at 114, 116, 57 S.Ct. 96, 81 L.Ed. 70; *Puerto Rico v. Russell & Co.,* 288 U.S. 476, 483, 53 S.Ct. 447, 77 L.Ed. 903 (1933); *Shoshone Mining Co. v. Rutter,* 177 U.S. 505, 20 S.Ct. 726, 44 L.Ed. 864 (1900). We therefore conclude that the Commission Act claims do not arise under federal law.

Thus, we hold that plaintiffs' claims which are based on the Hawaii Admission Act must be dismissed on the ground that the Act does not provide an implied individual cause of action. This is a dismissal on the merits. *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Plaintiffs' claims which are based on the Commission Act must be dismissed for lack of federal subject matter jurisdiction.[12]

REVERSED.

---

a federal statute in spite of the otherwise wholly state nature of this dispute, we surely would have "put [the] compass by." *Gully v. First Nat'l Bank, supra,* 299 U.S. at 118, 57 S.Ct. 96.

12. Section 4 of the Admission Act provides in part:

As a compact with the United States relating to the management and disposition of the Hawaiian home lands, the Hawaiian Homes Commission Act, 1920, as amended, shall be adopted as a provision of the Constitution of said State . . . subject to amendment or repeal only with the consent of the United States, and in no other manner . . . .

From this language, plaintiffs argue that the Commission Act is now "the substance of a compact between the United States and the State of Hawaii." Therefore, argue plaintiffs, an action charging a breach of the Commission Act arises under federal law. *League to Save Lake Tahoe v. Tahoe Regional Planning Agency,* 507 F.2d 517 (9th Cir. 1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1398, 43 L.Ed.2d 654 (1975). We disagree.

This language from section 4 clearly indicates that the substance of the compact was Hawaii's agreement to adopt the Commission Act as a provision of its constitution and not to amend the Act without the consent of Congress. We do not agree that this language is sufficient to incorporate the substance of the Commission Act itself as a federal-state compact.