CETA WORKERS' ORGANIZING COMMITTEE, Association of CETA Employees, CETA Artists Organization, District Council 37, AFSCME, AFL–CIO, and Stuart Adams, Loretta Argue, Ellen Clarke, Sandra Helling, Ellen Hoffman, Arthur Lesser, Ronald Mendel, Shelley Messing, Bess Mitchell, Stephen Price, Bernard Strassberg, Linda A. Taylor, Vivian Terry, and Harvey S. Thaler, on behalf of themselves and others similarly situated, Appellants,

v.

The CITY OF NEW YORK, Edward I. Koch, Stanley Brezenoff, Ronald T. Gault, Thomas A. McEnery, Michael Nadel, Edwin S. Holmgren, William Gallagher, Robert Payne, American Jewish Congress, on behalf of itself and others similarly situated, Ray Marshall, and James L. Ware, Appellees.

No. 406, Docket 79–7649.

United States Court of Appeals, Second Circuit.

Argued Oct. 26, 1979.

Decided March 5, 1980.

Eugene Martin-Leff, New York City, National Employment Law Project, Inc. (Walter M. Meginniss, Jr., Deborah Bachrach, New York City, National Employment Law Project, Inc.; Beverly Gross, Karen Smith, New York City, District Council 37, AFSCME; Lloyd B. Silverman, David Alleyne, James C. Meagher, Charles E. Tuohy, New York City, Bronx Legal Services, all of counsel), for appellants.

Stephen P. Kramer, New York City (Allen G. Schwartz, Corp. Counsel for the City of New York, L. Kevin Sheridan, New York City, of counsel), for appellees City of New York, Koch, Brezenoff, Gault, McEnery, and Nadel.

Saul G. Kramer, Francis D. Landrey, Proskauer Rose Goetz & Mendelsohn, New York City, of counsel, for appellee Holmgren.

George D. Zuckerman, Asst. Sol. Gen., Patricia C. Armstrong, Asst. Atty. Gen., Robert Abrams, Atty. Gen. of the State of New York, New York City, of counsel, for appellees Gallagher and Payne.

Rodger C. Field, Asst. U. S. Atty., Brooklyn, N.Y. (Edward R. Korman, U. S. Atty., E.D.N.Y., Harvey M. Stone, Asst. U. S. Atty., Brooklyn, N.Y., of counsel), for appellees Marshall and Ware.

Before FRIENDLY, OAKES and NEWMAN, Circuit Judges.

OAKES, Circuit Judge:

This appeal presents the question whether the Comprehensive Employment and Training Act as amended substantially in 1978 (CETA or "the Act")[1] either expressly or impliedly authorizes a private cause of action, against "prime sponsors" and other recipients of federal funds, by individual program participants claiming the following: inadequate training or services under the Act, failure to prepare individual "employability development plans," lack of efforts to bring about placement in unsubsidized employment, and lack of services by a state employment service. Also involved here is the question whether the Secretary of Labor and his Regional Director can be sued for alleged failures to monitor a prime sponsor's CETA program and to ensure enforcement of applicable law. The United States District Court for the Eastern District of New York, Jacob Mishler, Chief Judge, dismissed the complaint on the bases that plaintiffs had failed to state a claim upon which relief could be granted, Fed.R. Civ.P. 12(b)(6), and that the court was without subject matter jurisdiction, Fed.R.Civ.P. 12(b)(1). We affirm.

I. THE FACTS

This is a proposed, though as yet uncertified, class action brought on behalf of some 16,000 persons employed on or after April 1, 1979, by the City of New York or one of its contractors or subrecipients under the Public Service Employment (PSE) component of CETA, Titles II D and VI, 29 U.S.C. §§ 853–859, 961–970. Suit was brought against the City of New York, a municipal corporation and CETA "prime sponsor" eligible for, and the recipient of, federal funds for CETA programs, and against various city, state, and federal officials charged with parts of the program's administration. They include the following: the Mayor of New York City, the Commissioner of the Human Resources Administration (HRA), the Commissioner of the Department of Employment of HRA and his assistant, the Director of the Department of Personnel of the Civil Service Commission, and several other city officials; the Deputy State Administrator for New York City Courts; and the State Director of the New York State Employment Service (NYSES) of the New York Department of Labor, which under administrative regulations and contract with the City must provide employment referral and counseling, assistance in finding unsubsidized employment, and other employability development services to CETA employees of the City and its agencies, departments, subrecipients, and contractors. Suit was also brought against the American Jewish Congress (AJC), a non-profit corporation that is a CETA subrecipient of the City, and against a defendant class of more than 100 other CETA contractors and subrecipients, as well as against the United States Secretary of Labor and the Regional Administrator for Region II of the Labor Department's Employment and Training Administration.

The principal claim in the complaint is that the individual plaintiffs have not received "adequate training, employability counseling or services" while PSE participants. This claim is based on the proposition that the City defendants have allocated

---

1. The original legislation was the Comprehensive Employment and Training Act of 1973, Pub.L.No. 93–203, 87 Stat. 839. Since then, there have been intervening amendments, followed by the most recent and extensive revision, the Comprehensive Employment and Training Act Amendments of 1978, Pub.L.No. 95–524, 92 Stat. 1909 (codified at 29 U.S.C.A. § 801 et seq. (Supp.1979)).

substantially less than ten percent of fiscal-year 1979 Title II D and Title VI funds for these purposes, as required by the Act, §§ 232(b)(2), 603(a), 605(c), 29 U.S.C. §§ 854(b)(2), 963(a), 965(c). The failure to provide training is also alleged to violate §§ 201, 205(c)(4) and 602(a), (c) of the old Comprehensive Employment and Training Act of 1973, as amended prior to 1978, 29 U.S.C. §§ 841, 845(c)(4), 962(a), (c) (1976).

Other claims include the City's alleged failure to assist each individual class participant in establishing his or her "employability development plan," also known as a "personalized employability plan," in violation of a statutory required, CETA § 205(a), 29 U.S.C. § 845(a), and its failure to provide required periodic reviews of employment potential during tenure as PSE participants, assessments generally mandated by the statute, CETA § 605(c), 29 U.S.C. § 965(c), and spelled out by the regulations, 20 C.F.R. § 678.3(h). The complaint also cites a lack of efforts to bring about placement in unsubsidized employment, pursuant to §§ 201, 231, and 605(c) of the Act, 29 U.S.C. §§ 841, 853, 965(c). *See* 20 C.F.R. § 675.6(d).

As previously mentioned, the complaint also claims that the NYSES failed to provide required assistance, in violation of the Department of Labor Field Memorandum No. 307–78, as well as agreements between the State Employment Service and the City. Plaintiffs claim further that the federal defendants have failed to monitor adequately NYSES's compliance with the memorandum and the City defendants have failed to obtain such compliance. Finally, the claim is made that the City has failed by a significant margin to place half of its terminated PSE participants in unsubsidized employment, contrary to the 1977 CETA regulations, 20 C.F.R. §§ 96.33(c) and 99.36.

For purposes of this case we are, of course, required to assume that all of these alleged violations of the statute and regulations have occurred. The primary legal question presented, then, is whether a pri-

vate right of action may be brought under the Act.

## II. THE LAW

### A. *Express Right of Action*

Appellants first argue that § 106(*1*) of CETA, 29 U.S.C. § 816(*1*), explicitly authorizes actions in federal district court to pursue remedies for CETA violations.

Section 106(*1*) provides:

> The existence of remedies under this section shall not preclude any person, who alleges that an action of a prime sponsor or of any other recipient violates any of the provisions of the Act or the regulations promulgated under the Act, from instituting a civil action or pursuing any other remedies authorized under Federal, State, or local law.

Appellants argue that this section not only preserves state and local rights against any preemption argument, and preserves federal rights arising under statutes other than CETA against any implied repeal argument, but also separately authorizes the "instituting [of] a civil action." Appellants point to the "section by section analysis" contained in the Senate Report of its version of Section 106(*1*) (there numbered Section 106(e)), providing that "nothing in this act precludes a person who alleges a violation of the act or regulations from instituting a civil action." S.Rep. No. 891, 95th Cong., 2d Sess. 81, *reprinted in* [1978] U.S. Code Cong. & Admin.News, pp. 4480, 4561. This language is to some extent offset, however, by previous language in the Senate Report discussing the grievance procedures incorporated in § 106, stating that "[t]he amendment provides that remedies provided do not preclude remedies which are *otherwise* available under Federal, State, or local law." *Id.* at 16, *reprinted in* [1978] U.S.Code Cong. & Admin.News, pp. 4480, 4496 (emphasis added). This description suggests that the section merely preserves other rights rather than creates a new one. In conference, the House acceded to the Senate's version of this section; the conferees stated that "[t]he Senate bill pro-

vides that the existence of remedies does not preclude a person from instituting a civil action or pursuing other remedies authorized under Federal, State or local law. The House bill has no similar provision." House Conf.Rep. No.1765, 95th Cong., 2d Sess. 125, *reprinted in* [1978] U.S.Code Cong. & Admin.News, pp. 4480, 4590. Any reasonable reading of the legislative history leaves us at square one. A civil action against prime sponsors and subrecipients is not "precluded," but our question is whether it is explicitly authorized under § 106 for violations, as alleged here, that are subject to administrative grievance procedures.

The Secretary of Labor has construed the Act to mean that only in respect to "non-CETA" causes of action may civil actions or other remedies be pursued without first exhausting CETA administrative remedies. The regulations state that nothing in the Act shall "[a]llow any person or organization to file a suit which alleges a violation of CETA or these regulations without first exhausting the administrative remedies described," or "[b]e construed to create a private right of action." 20 C.F.R. § 676.81(c). Whatever respect may be due the agency on issues of program operation, however, it is not entitled to great deference in construing a statute as to implication of private remedies. *See Piper v. Chris-Craft Industries*, 430 U.S. 1, 41 n. 27, 97 S.Ct. 926, 949 n. 27, 51 L.Ed.2d 124 (1977) (agency's expertise "is of limited value when the narrow legal issue is one peculiarly reserved for judicial resolution, namely whether a cause· of action should be implied").

With ambiguous guidance from the legislative history, and direction from the regulations entitled to only light weight, we are thrust back to the plain words of the statute itself. At first blush, § 106(*l*) must mean something when it says that the "existence of remedies under this section shall not preclude any person, who alleges that an action of a prime sponsor or of any other recipient violates any of the provisions of the Act . . . from instituting a civil action." Read in the abstract, it is possible

to think that this phrase constitutes an affirmative, albeit backhanded, grant of authority to bring such an action. However, the statute must be read in context, both in relationship to the remaining provisions of § 106 (paragraphs (a)–(k)), and to § 107, 29 U.S.C. § 817.

When we turn to the remaining provisions of § 106, we see that this section of the statute sets up a two-tier grievance procedure, providing (1) that each prime sponsor, contractor, or grantee under the Act shall maintain a grievance procedure for handling program complaints "arising from its participants, subgrantees, contractors, and other interested persons," § 106(a), 29 U.S.C. § 816(a), and (2) that whenever the Secretary receives a complaint from any "interested person or organization . . . which has exhausted the prime sponsor's grievance system . . . or failed to achieve resolution of the grievance under the recipient's grievance system," § 106(b), 29 U.S.C. § 816(b), the Secretary must conduct an investigation and make a final determination not later than 120 days after receiving the complaint, *id.* The statute gives the Secretary authority to revoke all or any part of the prime sponsor's comprehensive employment and training plan and to terminate financial assistance thereunder, after notice and hearing, in certain enumerated situations, and generally if the prime sponsor "otherwise materially fail[s] to carry out the purposes and provisions of this Act or the regulations promulgated pursuant to this Act." § 106(c)(2)(G), 29 U.S.C. § 816(c)(2)(G). A similar authority is provided for the Secretary with respect to any recipient of funds, under § 106(d)(1), 29 U.S.C. § 816(d)(1). Pursuant to § 106(g), 29 U.S.C. § 816(g), the Secretary may withhold funds otherwise payable in order to recover amounts expended in any fiscal year in violation of any provision of the Act. The opportunity for prime sponsors to negotiate informally with the Secretary prior to the institution of sanctions for noncompliance with the Act is preserved under § 106(i), 29 U.S.C. § 816(i). The totality of these provisions, comprehensive and well-crafted to

the Act's administrative, institutional, and political exigencies, affirms the primacy and suggests the exclusivity of the grievance procedures, at least in cases seeking redress against a prime sponsor or other recipient of funds. The provisions certainly do not comport with statutory construction encouraging or even allowing a concomitant private right of action.

In addition, § 107, 29 U.S.C. § 817, permits judicial review of the Secretary's final action under § 106. If a prime sponsor or recipient is dissatisfied, or "any interested person is dissatisfied with or aggrieved by any final action of the Secretary authorized under section 106," such party may file for direct review in the federal court of appeals for the circuit in which the prime sponsor, recipient, or person resides or transacts business. Given the conjunction of §§ 106 and 107 as part of this elaborate administrative grievance procedure subject to judicial review, we think it would be curious construction to say that when action is not "precluded" it is thereby *ex proprio vigore* authorized. Because admittedly Congress has been less than clear on what it means, we think the most to be said about § 106(*l*) is that, should be find that an implied right of action exists, the elaborate provisions of §§ 106 and 107 do not stand in the way. Such provisions themselves remain, of course, key indicia of congressional intent. We therefore turn to a determination whether there is an implied right of action under the Act.

### B. *Implied Right of Action*

In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Court outlined four general factors to be considered in determining whether a private remedy was implicit in a statute not expressly providing for one. These factors included (1) whether the plaintiff was " 'one of the class for whose *especial* benefit the statute was enacted' "; (2) whether there was "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one"; (3) whether implication of such a remedy was "consistent with the underlying

purposes of the legislative scheme"; and (4) whether the cause of action was "one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law." *Id.* at 78, 95 S.Ct. at 2088 (citation omitted). Applying the *Cort v. Ash* tests, appellants make reasonable arguments that (1) as participants in the program, they are clearly *the* class Congress specifically intended to benefit; (2) if there is any indication of legislative intent one way or another, it is to create a remedy, as discussed above in reference to § 106(*l*); (3) the underlying purpose of the legislative scheme is "to provide job training and employment opportunities for economically disadvantaged, unemployed, or underemployed persons which will result in an increase in their earned income, and . . . assure that training and other services lead to maximum employment opportunities and enhance[d] self-sufficiency," CETA § 2, 29 U.S.C. § 801; and (4) the cause of action is one not traditionally relegated to state law and indeed is not in any way basically the concern of the states, since this is a federal program, although locally administered, and federal funds are involved.

In a series of more recent cases, however, the Supreme Court has emphasized that inferring a private right of action is "basically a matter of statutory construction" and that "what must ultimately be determined is whether *Congress* intended to create the private remedy asserted." *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, —— U.S. ——, ——, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979) (citations omitted) (emphasis added) (§ 206 of the Investment Advisers Act of 1940 does not imply private cause of action for damages); *see Touche Ross & Co. v. Redington*, 442 U.S. 560, 567, 99 S.Ct. 2479, 2484–85, 61 L.Ed.2d 82 (1979) (§ 17(a) of the Securities Exchange Act of 1934 does not create an implied right of action for damages against accountants who audit reports, based on misstatements in those reports); *cf. Chrysler Corp. v. Brown*, 441 U.S. 281, 316–17, 99 S.Ct. 1705, 1725, 60 L.Ed.2d 208 (1979)

(Trade Secrets Act does not afford a private right of action to enjoin disclosure in violation of the statute); *National Railroad Passenger Corp. v. National Association of Railroad Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974) (express language of a section of the Amtrak Act, interpreted in light of its legislative history and that of the whole Act, provides exclusive remedies, with no additional private action implied). The Court in doing so has cautioned us not to look abstractly at the "desirability" of inferring private rights of action thought *by us* to provide remedies effectuating the purposes of the given statute,[2] though of course the same considerations have no reference to any implication by Congress of such rights. We are thus, under *Transamerica*, thrown back to the tools of statutory construction.[3] It is obvious, then, that some of the same analysis must be done here as was required above when we were determining whether the statute *expressly* confers a cause of action. Whether or not the *Cort v. Ash* analytical framework is still required, *see* note 2, *supra*, it is nevertheless useful in discerning congressional intent absent clear language or legislative history.

In determining whether Congress intended to confer benefits to a specific class of individuals, under the first *Cort v. Ash* criterion, one possible comparison may be made between regulatory statutes that protect persons from harm, as in the case of,

*inter alia*, civil rights or securities fraud laws, and grant statutes conferring financial benefits. Without intending to exhume the rights/privileges distinction (which is probably dead-letter—it is at least moribund—as a matter of constitutional law, *see* L. Tribe, *American Constitutional Law* § 10–4, at 487 (1978)), it may nevertheless seem easier at first glance to find congressional intent for a private right of action when legislation explicitly protects a specified class of individuals, *e. g., Cannon v. University of Chicago*, 441 U.S. 677, 689–96, 99 S.Ct. 946, 1953–57, 60 L.Ed.2d 560 (1979) (Title IX prohibition against discrimination based on sex implies private right of action); *J. I. Case Co. v. Borak*, 377 U.S. 426, 432, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964) (Securities Exchange Act of 1934 implies private right of action; "[w]hile [the Act's] language makes no specific reference to a private right of action, among its chief purposes is 'the protection of investors,' which certainly implies the availability of judicial relief"); *see generally* Note, *Implied Rights of Action to Enforce Civil Rights: The Case for a Sympathetic View*, 87 Yale L.J. 1378, 1383–85 (1978), as opposed to when, one might argue, it offers only a form of financial assistance. Even among grants statutes, it is possible to distinguish between those which automatically entitle an entire group to benefits based on objective eligibility criteria and those which authorize benefits to be dispensed as a mat-

---

**2.** In fact, the validity of exclusive reliance on application of the *Cort v. Ash* four-factor test to assess the appropriateness of implying a private remedy must now be questioned. The *Transamerica* Court notes:

"It is true that in *Cort v. Ash, supra,* the Court set forth four factors that it considered 'relevant' in determining whether a private remedy is implicit in a statute not expressly providing one. But the Court did not decide that each of these factors is entitled to equal weight. The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action."

—— U.S., at ——, 100 S.Ct., at 249 (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979)). *But see Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)

(applying four-factor *Cort v. Ash* test to find private cause of action implied under Title IX).

**3.** This does not mean, we take it, that cases such as the landmark *J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), in the securities area, *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), in the discrimination area, or *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), in the constitutional area, are somehow sub silentio overruled. Rather, we suppose the Court is sending to Congress and the lower courts a message that, in future statutory drafting, more explicitness will be required than was present in these cases. The Court seems to be hitting this political ball back into Congress's court.

ter of discretion. In this way, perhaps, a CETA job is not as much a statutory entitlement as, say, the right to receive a welfare payment, automatically triggered if an individual satisfies certain basic criteria. *See Goldberg v. Kelly,* 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970). Since CETA provides funding for only a limited number of jobs, far less than would be needed to employ the total number of persons in the unemployed class, one might argue that Congress, by its explicit under-inclusiveness, has not created a *right* for all unemployed to receive proper training and employment, but only for those who volunteer and are selected to participate in the program. But once unemployed persons accept PSE jobs, thereby agreeing to participate for eighteen months in a governmental program, it becomes increasingly hard to believe that Congress did not intend to create benefits for this smaller class.[4] Presumably Congress did have in mind that such participants would receive job train-

ing, and that they would be helped in finding unsubsidized employment.

■ Whether or not the first test of *Cort v. Ash* is met, however, the second and third criteria, which now evidently go only to statutory construction, are not, because CETA provides a comprehensive administrative procedure for determination of complaints, under which the Secretary is authorized to correct violations of the Act, § 106 *supra,* subject to judicial review, § 107 *supra.* As indicated in *National Railroad Passenger Corp. v. National Association of Railroad Passengers, supra,* a "frequently stated principle of statutory construction is that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." 414 U.S. at 458, 94 S.Ct. at 693.[5] Congress, relying on the Secretary's expertise and ability to balance the various elements of the program in the interest of the various recipients, present and future participants, and so on, has established an elaborate system of

4. Presumably a CETA job falls somewhere between a statutory entitlement to receive welfare payments and a "right" to receive funding to do sculpture from the National Endowment for the Arts. In the former case, Congress has clearly evinced its primary purpose to aid the poor, while in the latter it has attempted to encourage creativity rather than to improve the financial lot of all artists. CETA falls somewhere in between, although we think much closer to the welfare example.

While the federal appellees argue that CETA is nothing more than a "grant program established to provide a framework for the administration of federal funds," Brief of Federal Appellees at 23, and the City appellees argue that the Act "merely set[s] out the manner in which the federal funds should be spent," Brief of City Appellees at 4, "a federal grant program detailing the mechanism and conditions by which federal funds may be spent," *id.* at 9, we find nothing in the Act or in its legislative history to indicate that Congress had such a narrow objective. Rather, CETA was plainly designed to assist the unemployed and underemployed through temporary employment and training so as to upgrade participants and enhance their employment opportunities. And while the federal appellees urge that the "purpose of the Act is to remedy a generalized condition, rather than to benefit particular persons," Brief of Federal Appellees at 24, we find that there is a special class of people to whom the Act ad-

dresses itself, namely selected individuals who are "economically disadvantaged, unemployed, or underemployed persons," CETA § 2, 29 U.S.C. § 801.

5. Although we find here that CETA's provision of a comprehensive administrative procedure subject to judicial review appears to indicate congressional intent against a private right of action, we do not mean to say that, any time a statute contains administrative remedies, Congress has precluded all private rights of action. Among the factors requiring analysis is whether the administrative remedies provide relief for the specific claims of the plaintiff. As the Court noted in *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979):

The fact that other provisions of a complex statutory scheme create express remedies has not been accepted as a sufficient reason for refusing to imply an otherwise appropriate remedy under a separate section . . . Rather, the Court has generally avoided this type of "exclusion into extrapolation of legislative intent," *Cort v. Ash, supra,* 422 U.S., at 82 n. 14, [95 S.Ct., at 2090 n. 14], unless there is other, more convincing, evidence that Congress meant to exclude the remedy. See *National Railroad Passenger Corp. v. National Assn. of Railroad Passengers, supra,* 414 U.S., at 458–461 [, 94 S.Ct., at 693–694].

administrative review, which would appear intended to be exclusive.[6]

We cannot envisage a court's easily determining how much training and counseling is needed in each given case, particularly where to do so would require an elaborate structural-type injunction, in turn necessitating judicial oversight rather than agency administration of the Act.[7] Appellants argue that their claims may be rather simply adjudicated by the court since, for example, it could be readily determined whether the City has spent the required ten percent on its training programs. This one example may be valid, but surely the complaint raises questions in addition to the mere expenditure of funds. Paragraph 55 of plaintiffs' complaint specifically alleges that the individual plaintiffs "have not received adequate training, employability counseling or services, as contemplated in the Act, during their tenure as PSE participants," and relief sought includes an injunction to ensure fulfillment of the training requirement, as well as rehiring and nontermination of employment, the CETA grievance procedure is specifically made available to participants such as appellants, and the sanctions are many, contemplating a cutoff of funds by the federal administrator in whole or in part, as well as the ordering of such corrective actions as are appropriate under § 106(d), 29 U.S.C. § 816(d). Under the

statutory scheme, if the appellants' allegations are supported, the Secretary is authorized to order the City of New York and other CETA recipients to take corrective action or risk suspension of funds, § 106, 29 U.S.C. § 816; 20 C.F.R. § 676.91(c).

Appellants argue that the administrative process here would be too time consuming. Affidavits were submitted to the effect that it would be "futile" to file an administrative complaint and that, as part of a research study, the Labor Department's New York office delayed in processing CETA complaints in mid-1978. But so far as appears, there has been no attempt whatsoever to utilize the administrative process for correction of conditions alleged in the instant complaint. Furthermore, there is no allegation that the New York office is not now complying with the time limitations set forth in the current regulations under the statute. Thus, the argument that the administrative process is overly time consuming is purely speculative.[8]

We conclude that there is no implied right of action under the Act.

### C. Subject-matter Jurisdiction Over Federal Appellees

Appellants argue that, even if there is no private right of action under CETA against prime sponsors and subrecipients, their com-

**6.** Appellants cite *Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), but this was a case involving a constitutional attack on a New York welfare statute, and therefore is obviously not on point. Furthermore, in *Rosado* the petitioners could not have obtained an administrative ruling satisfying their claim in any event, since the federal agency involved did not permit petitioners to participate in a review of the State's program. *Id.* at 405–07, 90 S.Ct. at 1214–15. Our own recent *Hark v. Dragon*, 611 F.2d 11 (2d Cir. 1979) (where CETA participants attacked a Vermont state policy limiting CETA participation to one year), is also not to the contrary. There, exhaustion of administrative remedies would have been futile, since the policy under attack had been suggested by the Department of Labor and the issue was purely a legal one. *Id.* at 14. Furthermore, the court reached the merits directly, without exhaustion of administrative remedies, on the basis of jurisdiction over the constitutional claims of plaintiffs, with only pendent jurisdiction over the statutory claims. *Id.* at

14. The *Hark* panel did not reach the question whether the district judge was correct in holding that 29 U.S.C. § 816(*I*) authorized the plaintiffs to sue without exhaustion of the administrative procedures set forth in the Act. *Id.* at 14 n. 4.

**7.** *But see* Fiss, *The Supreme Court, 1978 Term —Foreword: The Forms of Justice*, 93 Harv.L. Rev. 1, 33–35 (1979). Although it is certainly possible that Congress would grant a private right of action concurrent with a system of agency oversight, it is difficult to understand, absent language to the contrary, what benefits would be gained from such dual review, particularly when judicial review of the Secretary's action is explicitly vested in the appellate courts.

**8.** If we were to apply the fourth prong of the *Cort v. Ash* test, the subject matter of this case would surely be found to be federal in nature.

plaint nevertheless states claims against the two federal officials for failing to enforce elements of CETA, with federal jurisdiction obtaining under 28 U.S.C. §§ 1331, 1337, 1361. These claims include: (a) failure to enforce CETA training requirements in the case of the City's program (Complaint ¶ 59); (b) failure to enforce the employability plan and assessment requirements of the Act in the City's case (*id.* ¶ 69); (c) failure to monitor the City, its subrecipients and contractors, as to their compliance with CETA regulations calling for "transitional" employment and the rendering of services leading to placement in unsubsidized employment (*id.* ¶ 79); (d) failure to monitor NYSES to ensure its compliance with the U.S. Department of Labor Field Memorandum No. 307–78 dated May 22, 1978, pertaining to transition of PSE participants into unsubsidized employment (*id.* ¶ 83); and (e) acquiescence in the City's and subrecipients' failure to meet placement goals, contrary to CETA regulations (*id.* ¶ 89).

Section 1331 provides jurisdiction for agency action review authorized by the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706. *Standard Oil Co. v. FTC*, 596 F.2d 1381, 1384 (9th Cir. 1979); *Dresser Industries, Inc. v. United States*, 596 F.2d 1231, 1238 (5th Cir. 1979), *petition for cert. filed*, —— U.S. ——, 100 S.Ct. 731, 62 L.Ed.2d 730 (1979). *See also Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977) (§ 1331(a) provides jurisdiction, not the APA); *Central Hudson Gas & Electric Corp. v. EPA*, 587 F.2d 549, 555 (2d Cir. 1978) (APA involved implicitly to authorize bringing of action).

■ Three basic questions must be examined, however, before we may determine whether the Secretary's alleged failures are reviewable under the APA: first, whether a statute precludes judicial review, 5 U.S.C. § 701(a)(1); second, whether agency action is committed to agency discretion by law, *id.* § 701(a)(2); and third, whether there is final agency action for which there is no adequate judicial remedy other than review under the APA, *id.* § 704. *See Standard Oil Co. v. FTC, supra*, 596 F.2d at 1385.

■ The first question, then, is whether the provision of CETA permitting appellate court review of the Secretary's action (or inaction) on grievances against prime sponsors and subrecipients, § 107, 29 U.S.C. § 817,[9] precludes direct review in district court. It may be true, as appellants suggest, that there is no administrative procedure to bring complaints against the Department of Labor itself and that § 107 does not explicitly preclude any other version of judicial review. But this also does not necessarily mean that the review section is nonpreclusive as to the review sought by appellants here. To be sure, the § 106 grievance procedure, as we have already discussed, relates only to grievances against (or by) prime sponsors and subrecipients. But it seems clear from the language of § 107 that Congress intended judicial review to occur in the court of appeals *after* the Secretary's action upon such grievances, as the exclusive judicial method

---

9. Section 107, 29 U.S.C. § 817, provides:

(a) If any prime sponsor is dissatisfied with the Secretary's final action with respect to the disapproval of its comprehensive employment and training plan under section 814 of this title, or if any recipient is dissatisfied with the Secretary's final action with respect to a sanction under section 816 of this title, or if any interested person is dissatisfied with or aggrieved by any final action of the Secretary authorized under section 816 of this title, such prime sponsor, recipient, or person may, within 60 days after notice of such action, file with the United States court of appeals for the circuit in which the prime sponsor, recipient, or person resides or transacts business a petition for review of such action.

(b) The findings of fact by the Secretary, if supported by substantial evidence, shall be conclusive, but the court, for good cause shown, may, in whole or in part, set aside the findings of the Secretary or remand the case to the Secretary in whole or in part to take further evidence, and the Secretary may thereupon make new or modified findings of fact and may modify the previous action, and shall certify to the court the record of the further proceedings.

Although § 106(*l*), 29 U.S.C. § 816(*l*), explicitly does not preclude certain civil actions, such actions may be instituted only against prime sponsors or other recipients of funds. The provision does not speak to actions brought against the Secretary or the Department of Labor.

of monitoring the federal agency's own enforcement of the Act vis-a-vis the prime sponsors or subrecipients. *See Aquavella v. Richardson,* 437 F.2d 397, 402 (2d Cir. 1971) ("Where the Medicare Act establishes procedures for review of the Secretary's decision, a court may not review that decision by any other means. However, where the Act does not provide such procedures, section 405(h) does not preclude review."). *See also Whitney National Bank v. Bank of New Orleans,* 379 U.S. 411, 422, 85 S.Ct. 551, 558, 13 L.Ed.2d 386 (1965) ("[W]here Congress has directed such a procedure [for obtaining review], the doctrine of exhaustion of administrative remedies comes into play and requires that the statutory mode of review be adhered to *notwithstanding the absence of an express statutory command of exclusiveness.*") (emphasis added). Every one of the claims made against the federal appellees here revolves around failure to enforce against a prime sponsor or subrecipient, failure to monitor them, or acquiescence in their noncompliance with the Act, regulations, or whatever. No claim relates to an action or inaction of the Agency mandated by the statute and impinging directly upon the appellants, *i. e.,* appellants are injured only insofar as the federal appellees have refused or failed to make the City and its subrecipients conform to the Act and regulations. Since the grievance and judicial review procedures outlined in §§ 106 and 107 seem expressly designed to deal with complaints such as those made by appellants, and since any other interpretation would permit "unnecessary duplication and conflicting litigation," *Whitney National Bank v. Bank of New Orleans, supra,* 379 U.S. at 422, 85 S.Ct. at 558, we are impelled to the conclusion that Congress intended the review procedure set forth in § 107 to be exclusive as to claims grounded upon a prime sponsor's or subrecipient's inadequate or illegal actions.

On the question whether the district court properly had mandamus jurisdiction under 28 U.S.C. § 1361, since determination of mandamus jurisdiction necessarily encompasses on-the-merits analysis of whether a mandamus writ should issue, *see*

*generally* Byse and Fiocca, *Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action,* 81 Harv.L.Rev. 308 (1967); *Century Arms, Inc. v. Kennedy,* 323 F.Supp. 1002, 1005 (D.Vt.), *aff'd,* 449 F.2d 1306 (2d Cir. 1971), *cert. denied,* 405 U.S. 1065, 92 S.Ct. 1494, 31 L.Ed.2d 794 (1972), and since we already have found that plaintiff's suit is precluded by statute, the denial of mandamus jurisdiction follows.

As to jurisdiction under 28 U.S.C. § 1337, even if we were to find it here, we think the APA would likewise govern our standard of reviewability.

Given our conclusion above, we need not reach the questions whether the alleged failures to enforce/monitor were matters committed to agency discretion or whether the action of the federal appellees was sufficiently "final."

Judgment affirmed.

